Filed 7/16/26  In re Kendra S. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re KENDRA S., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent;<br><br>S.R.,<br><br>    Defendant and Respondent,<br><br>        v.<br><br>O.S.,<br><br>    Defendant and Appellant. | G066238<br><br>(Super. Ct. No. 19DP0765A)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, June Jee An, Judge. Affirmed.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Chloe R. Maksoudian, Deputy County Counsel, for Plaintiff and Respondent.

Diana W. Prince, under appointment by the Court of Appeal, for Defendant and Respondent.

No appearance for the Minor.

\* \* \*

At the termination of this dependency case involving Kendra S., the juvenile court issued exit orders awarding sole physical custody to her father (Father), and joint legal custody to Father and Kendra's mother (Mother). Father challenges this order on appeal, arguing the court should have granted him sole legal custody. We find no abuse of discretion. The court's order was reasonable given evidence that Mother was still involved in Kendra's life, was attending medical appointments and meetings at school, and that Father and Mother had been able to reach agreements concerning Kendra's medical care and education. Thus, the court's custody order is affirmed.

## FACTS AND PROCEDURAL HISTORY

### I.

### PRIOR DEPENDENCY PROCEEDING

Kendra S. is currently seven years old. Her parents, Mother and Father, were never married and have had a volatile relationship, including an extensive history of domestic violence. They were previously involved in a dependency proceeding involving Kendra, which terminated in May 2021. At the end of that proceeding, full physical custody of Kendra was awarded to Father, and joint legal custody was awarded to Mother and Father. Mother was authorized to have supervised visitation.

### II.

### THE CURRENT DEPENDENCY PROCEEDING

*A. Dependency Initiated*

2

On December 3, 2024, the Orange County Social Services Agency (SSA) filed a protective custody warrant to remove Kendra from Father's physical custody. Kendra was removed from Father's home the next day and placed with her paternal grandparents.

SSA filed a dependency petition (petition) against Mother and Father under Welfare & Institutions Code section 300, subdivisions (b)(1) and (c). Generally, the petition alleged that (1) Father engaged in inappropriate rough play with Kendra, (2) the parents' volatile relationship and continued domestic violence put Kendra at risk of physical or emotional injury, (3) both parents could have unresolved mental health issues, (4) both parents had a history of substance abuse, (5) Father had a criminal history for narcotics, battery, and domestic violence, and (6) Kendra was a previous dependent of the juvenile court.

A jurisdiction hearing was held on December 26, 2024. Father submitted on the petition, while Mother pleaded no contest. The juvenile court found the petition's allegations true by a preponderance of the evidence. The court released Kendra to Father's care under various protective orders, including that the parents only speak to each other using TalkingParents.[1]

At the disposition hearing on February 26, 2025, Kendra was found to be a dependent of the juvenile court. The court also found that it was in Kendra's best interest to remain in Father's physical custody with visitation to Mother. It set a six-month review hearing to check each parent's progress.

---

[1] "TalkingParents is a court-mandated, online coparenting communication tool that records the time messages are sent and read, prevents messages from being altered or deleted, and is admissible in court." (*K.L. v. R.H.* (2021) 70 Cal.App.5th 965, 974.)

3

*B.  SSA's Reports*

SSA's report dated August 19, 2025, stated that Father had completed his case plan services and had been testing negative for drugs. He appeared to have learned from his services and was providing Kendra with a safe environment.

As to Mother, SSA's report found she had made "moderate" progress on her case plan.[2] She was participating in domestic violence therapy and was doing well in her outpatient substance abuse program. But Mother tested positive for alcohol 13 times since the end of April 2025. She also tested positive for cocaine and methamphetamine about four times. Mother denied using drugs and claimed the positive tests resulted from medication.

As to visitation, the report noted that Mother was scheduled to have two three-hour supervised visits with Kendra a week. Generally, Kendra enjoyed her visits with Mother and wanted to spend more time with Mother and Kendra's younger brother (Mother's son from a different relationship). However, Kendra expressed to SSA several times that she preferred that visits remain supervised. Among other things, she did not like that Mother's home was not clean and that Kendra's brother was "'bad' sometimes" and would hit her. There were also reports that staff at the visitation center had advised Mother several times to monitor Kendra's brother because he was "out-of-control" and would disrupt other visitors. SSA's report also reflected that Mother canceled or was a "'no show'" at about seven visits from April to August 2025.

---

[2] We focus on the facts pertinent to Mother since this appeal concerns her parental rights.

Addendum reports filed in September 2025 showed that Mother tested negative for drugs from late August through September except for one positive test for cocaine.

The addendum reports also reflected that Father stated that visits between Kendra and Mother "were going okay." Father said that Kendra enjoyed her visits with Mother. He believed it was important for Mother to be involved in Kendra's life, but he did not feel comfortable with allowing Mother unsupervised visitation.

C. *Testimony at the Six-Month Review Hearing*

At the six-month review hearing, Father requested full physical and legal custody. Several witnesses were called to testify.

Kendra testified that she saw Mother for visitation twice a week. Kendra wanted visits with Mother to continue but preferred that they remain supervised because her brother was too aggressive at times. She would be okay with unsupervised visits with Mother if her brother was not there. Kendra further testified that Father told her what to say to social workers "[a] lot." In particular, Father told her to tell social workers that she wanted supervised visits.

Social worker Heather Choyce recommended closing the dependency case and granting Father sole legal and physical custody. Choyce expressed concerns over Mother's sobriety, Mother's inability to control Kendra's brother, and Kendra's statements that she did not want unsupervised visits with Mother. Choyce believed Father should have sole legal custody because he had "more involvement" in Kendra's medical care and schooling. She recognized that Mother had "participated in some school activities." But "due to [Mother] and [Father] both having restraining orders and lack of communication, [she had not] seen [Mother] involved in any other

appointments or . . . any other services outside of school." Choyce clarified that she believed Mother had the capacity to make decisions concerning Kendra's health and education. But Choyce was worried about Mother's availability due to "her inconsistency with visits or being able to get Kendra."

Mother admitted to previously using marijuana but claimed that she had stopped because it made her paranoid and anxious. She also admitted to drinking but claimed she did not have any issues with alcohol. Mother claimed that she missed visits with Kendra due to issues finding childcare for Kendra's brother.

Mother testified that she always went to Kendra's medical appointments and recounted an appointment she had gone to last year to remove a wart from Kendra. Both Mother and Father had agreed on this treatment. Mother acknowledged that she and Father once had a major disagreement about Kendra's dental care. Father wanted to pursue a more aggressive treatment while Mother preferred a more conservative approach. Mother ultimately went along with Father's preferred treatment. Mother did not state when this disagreement occurred, but she claimed that healthcare decisions had "been smooth" since then.

Mother also stated that Father did not tell her what schools Kendra would attend until Kendra was already enrolled. Still, she agreed with Father as to the choice of Kendra's current school. Mother went to Kendra's school appointments and discussed a meeting she had with Kendra's teacher the prior month. Mother also stated she signed up for notifications from the school so she could be informed of Kendra's activities each day.

Finally, Mother stated that she would like to put her differences with Father aside to make decisions for Kendra's best interest. She stated,

"[i]t's not about me anymore . . . . [i]t's about Kendra, and I'm willing to wave my white flag at this point. You got to see the brilliance she displayed in court."

Father stated that he had been Kendra's primary caretaker for nearly all her life. Mother had "a lot of domestic violence and a lot of issues where [she] would show that she [could not] make legal decisions when [he] needed it." He further stated that Mother missed visits and either ignored his communications on TalkingParents or responded combatively.

Father elaborated on the dental issue Mother had raised during her testimony. He explained that Mother initially stopped the dental procedure from being performed by "threaten[ing] the [dentists] and tell[ing] them that she ha[d] 50/50 custody, and they [could not] perform anything on Kendra until she approve[d] it." Father conceded, however, that aside from the dental issues, there had not been any "other medical issues that [Mother] ha[d] obstructed [him] on."

Father also claimed that Mother missed school meetings. He testified that Mother was supposed to attend a school meeting the prior month. He was going to attend in-person and have her on speaker phone using TalkingParents, but Mother missed the meeting. Father conceded, though, that Mother made her own appointment with the school later in the week. Father also vaguely stated that Mother made it difficult to make decisions to "[j]ust sign[] [Kendra] up for . . . extra events or after-school events." He was concerned that Mother would use joint legal custody "as an excuse to violate the restraining order that [they] currently have."

Father summarized his objection to joint legal custody by explaining that such an arrangement would (1) "delay the process if there was an immediate decision needed," and (2) create arguments between

7

Mother and Father that would be harmful to Kendra's emotional development.

Kendra's stepmother (Father's wife) testified that Mother had missed dental and medical appointments due to conflict or scheduling issues.[3] She did not give any specific examples of missed appointments or provide an estimate of how many appointments were missed. Kendra's stepmother also did not believe that Mother was involved in or interested in Kendra's schooling. Rather, she believed Mother wanted to have joint legal custody of Kendra to control Father.

D. *The Juvenile Court's Findings*

After the presentation of evidence, the juvenile court terminated dependency proceedings. However, it explained that it "did not find any of the parents' testimony or [Kendra's stepmother's] testimony persuasive at all. It was all very, very self-serving. So [it took] all of [their] testimony with a grain of salt. [¶] The only testimony that [the court] found truly helpful was Kendra's and the social worker, Ms. Choyce[]." The court then issued exit orders awarding joint legal custody of Kendra to both Mother and Father and full physical custody to Father (the custody order). Mother would have six hours of weekly supervised visitation.

As to legal custody, the juvenile court explained that it found no "reason to remove [M]other's decision-making power regarding any medical or educational decisions." The court noted that Mother had remained

---

[3] Father lives in Irvine while Mother lives in Long Beach. Father's opening brief concedes that "most, if not all of Kendra's medical providers live in Irvine. The two locations are, depending on traffic, at least one-half hour apart and, during rush hours, it could take more than an hour to traverse the distance between [Father's] home and [Mother's] home." Kendra also attends school in Irvine.

involved in Kendra's life. While Mother lived in Los Angeles County, she had not missed medical or educational appointments for Kendra and attended appointments over the phone when she could not attend in person. Further, the one example given by both parties about their medical disagreement ended with Father's preference being used.

While there was conflict between Mother and Father, the juvenile court did "not believe that the solution to that [was] to remove [Mother's] decision-making power." Likewise, it did "not believe that parents should have their legal custody removed unless . . . there is some impediment to them making those decisions on behalf of the minor."

Father appeals the portion of the custody order granting the parents joint legal custody. He claims the juvenile court should have granted him sole legal custody. We find no error.

DISCUSSION

"[T]he juvenile court has broad discretion to make custody orders when it terminates jurisdiction in a dependency case." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 265, fn. 4.) Such orders are reviewed for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) "An abuse of discretion is only demonstrated when no reasonable judge could have made the challenged order." (*In re Marriage of Barth* (2012) 210 Cal.App.4th 363, 374.)

Mother and Father had joint legal custody prior to the start of this dependency case. Based on the above evidence, the juvenile court could reasonably conclude there was no reason to modify this custody arrangement. There was evidence that Mother was involved in Kendra's life, including attending medical appointments and school meetings. While the parties did not get along, the record indicated they were still able to make decisions

9

about Kendra's well-being. Indeed, the testimony only showed one major conflict over a medical decision, which was resolved in favor of Father's preference. Choyce likewise testified that she believed Mother had the capacity to make decisions concerning Kendra's health and education. Given this evidence, the court reasonably chose to maintain joint legal custody.

Father appears to argue that the juvenile court erred in weighing evidence. He contends that Mother's testimony was full of lies and half-truths, while he "presented himself as being reasonable and willing to cooperate." He also highlights evidence in the record supporting his claim for sole legal custody, such as Mother's positive drug and alcohol tests.

Father misunderstands our role on appeal. "In determining whether there has been . . . an abuse [of discretion], we cannot reweigh evidence or pass upon witness credibility. The trial court is the sole arbiter of such conflicts. Our role is to interpret the facts and to make all reasonable inferences in support of the order issued." (*Dodge, Warren & Peters Ins. Services, Inc. v. Riley* (2003) 105 Cal.App.4th 1414, 1420.) Put differently, it is immaterial that the lower court could have reached a different result had it weighed the evidence differently. As set forth above, the custody order was reasonable given the evidence presented.

We are also unpersuaded by Father's citations to *In re M.R.* (2017) 7 Cal.App.5th 886, and *In re C.W.* (2019) 33 Cal.App.5th 835. The conduct of the parents that lost legal custody in those cases was far more extreme than Mother's conduct here.

In *In re M.R., supra,* 7 Cal.App.5th at pages 902, 906, the appellate court affirmed the trial court's decision awarding sole legal custody to the father. The record showed the mother "suffer[ed] from drug addiction; had abandoned the children with the maternal grandmother and just '[taken]

10

off'; had engaged in domestic violence with her live-in boyfriend; and had failed to protect the children from physical violence at the hands of her live-in boyfriend." (*Id*. at p. 902.) Here, Mother has not abandoned Kendra, nor is there any evidence that she has failed to protect Kendra from physical violence. Further, while Mother tested positive for drugs, we are not aware of any statement in the record that Mother has a drug addiction.

We are unsure why Father believes *In re C.W., supra,* 33 Cal.App.5th at pages 841–842, has any bearing here. In that case, the father had been previously arrested for aggravated rape and accused of touching a four-year old's vagina and raping two other minors. There was no evidence that he had "ever received services or treatment of any kind to address his sexually inappropriate behavior toward children, or other evidence demonstrating [the father's] past history no longer posed a risk to his son." (*Id*. at p. 863.) Further, the evidence showed that after the child began living with the father, he was expelled "from school for downloading pornography, [began] engaging in sexual behavior at home that was so troubling his stepmother had wanted a restraining order, and . . . sexually molest[ed] his younger half-sister." (*Id*. at pp. 863–864.) Based on these facts, the appellate court reversed the lower court's order granting father sole legally custody. (*Id*. at pp. 837–838.)

Finally, Father's reply brief raises a new argument that the juvenile court applied the wrong legal standard. His argument centers on the court's statement that it did "not believe that parents should have their legal custody removed unless . . . there is some impediment to them making those decisions on behalf of the minor." Father asserts that the "common sense understanding of the term [impediment] would mean that [Mother] would be suffering from some mental (or physical) impairment that would prevent her

11

from making decisions in the best interest of the child." He then contends that "[t]o the extent . . . that the trial court believed that it could deprive [Mother] of joint legal custody only if there was proof of some mental/physical impairment, it was wrong and that establishes an abuse of discretion as well."

Father "has failed to explain why [he] did not . . . make this argument in [his] opening brief. We do not consider arguments made for the first time in a reply brief, primarily because it denies [Mother] the opportunity to counter the argument." (See *LAOSD Asbestos Cases* (2026) 118 Cal.App.5th 1041, 1060.)

Besides, Father's argument is based on a misinterpretation. He mistakenly infers that the juvenile court used "impediment" to refer to a mental or physical impairment. But nothing in the record supports this interpretation. The court made the above statement while explaining that Mother and Father had been able to agree on most decisions affecting Kendra despite their personal differences. The court was stating that parents should not lose legal custody unless they are obstructing decision making. (See Dictionary.com (2026) <https://www.dictionary.com/browse/impediment> [as of July 14, 2026], archived at https://perma.cc/S7VN-CL8E [defining "impediment" to mean an "obstruction; hindrance; obstacle"].) It was not suggesting that Mother could only lose legal custody if she had a mental or physical impediment.[4]

---

[4] Several of Father's arguments are based on conjecture. For example, he speculates that Mother "appears to [*sic*] an example of that horrific parent who hates the 'ex' more than she loves the child. That kind of person should not have any say so in the medical and educational needs of the child." He also hypothesizes that some of Mother's actions are "perhaps . . . her way of

DISPOSITION

The juvenile court's custody order is affirmed.


                                             MOORE, J.

WE CONCUR:


MOTOIKE, P. J.


DELANEY, J.

---

expressing guilt for putting drugs above her daughter?" We will not address these speculative arguments.